IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTEHRN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

MYRON G. THOMAS                                     PLAINTIFF-APPELLANT

VERSUS                                    CIVIL ACTION NO. 1:10-CV-472-HSO-JMR

MICHAEL J. ASTRUE,                                   DEFENDANT-APPELLEE
COMMISSIONER OF SOCIAL SECURITY

## REPORT AND RECOMMENDATION

This cause comes before this Court on Plaintiff's Motion [13] for Summary Judgment. Plaintiff's Motion is accompanied by a Memorandum [14] in Support. Defendant has filed a Response [17] in Opposition and a Memorandum [18] in Support of his Response. Plaintiff has filed a Motion [19] for an Extension of Time to File a Response/Reply. Having considered the Motion [13], Defendant's Response [17], the Memorandums in Support [14;18], the Plaintiff's Motion [19] for an Extension of Time to File a Response/Reply, and the record of the proceedings below, along with the record as a whole and the relevant law, this Court recommends that Plaintiff's Motion for Summary Judgment be denied.

## ADMINISTRATIVE PROCEEDINGS

On May 31, 2007, Myron G. Thomas (hereinafter referred to as "Plaintiff") applied for disability insurance benefits, claiming a disability onset date of July 23, 2004, which was later amended to May 4, 2005. (Pl.'s Mem. [14] 1) Plaintiff's petition was denied by the Commissioner of the Social Security Administration on his initial application, as well as on reconsideration. *Id.* Plaintiff, then, requested and was granted an administrative hearing before an Administrative Law Judge (hereinafter referred to as "ALJ"). (Tr. 21-64) At the administrative hearing, held on May 20, 2009, ALJ Wallace Weakley found there was substantial evidence in the record to show that Plaintiff did not meet the criteria set forth by the Social

Security Administration to be considered "disabled". *Id.* ALJ Weakley relied on both 20 CFR § 404.1520 and the testimony of a vocational expert as the basis of his finding. (Tr. 20) The Appeals Council denied Plaintiff's request of review in July of 2010. (Tr. 1) Plaintiff brings this action for judicial review. *Id.*

## FACTS

Plaintiff was 48 years old at the time he initially applied for and was denied benefits. (Pl.'s Mem. [14] 2) He has a high school diploma, and was last employed full time as a cook in 2001. *Id.* Plaintiff is alleging disability as of May 4, 2005, as previously amended from July 24, 2004. *Id.*

Plaintiff claims he suffers from many disabilities, including diabetes, high blood pressure, severely crooked or broken bones and vision problems. (Tr. 28-29) According to the findings of the ALJ, his most severe impairments are a status post right knee injury, pancreatitis and ethanol abuse. (Pl.'s Mem. [14] 2) Plaintiff contends that these disabilities have made it very difficult for him to obtain and continue to perform any work for a significant period of time, as well as conduct normal everyday activities such as driving a car or walking for a sustained period of time without sitting down. *Id.* Due to these difficulties, Plaintiff contends that he has not been employed since he was a part time chef for the Biloxi Veterans Administration Hospital (hereinafter referred to as "VA") in 2004. (Tr. 10) Prior to his 2004 employment, Plaintiff was a part time cook at Denny's Restaurant ending in 2001. *Id.* Due to various physical limitations which made it difficult to perform his job, Plaintiff asserts that he was forced to leave these positions. *Id.*

At Plaintiff's administrative hearing, the ALJ determined that a right knee injury, pancreatitis and ethanol abuse are Plaintiff's most significant disabilities. (Tr. 17) With regard to the knee injury, the record indicates that the Plaintiff injured his knee playing in a pickup basketball game while serving in the military. *Id.* On October 15, 2004, Plaintiff began feeling a lingering knee pain and visited the VA Medical Center. *Id.* On that same day, Plaintiff received an X-ray on his right knee, which revealed a very small narrowing of the joint space in his right knee. *Id.* Plaintiff subsequently required a walking cane and crutches to move around. *Id.* On April 29, 2005, after Plaintiff's right knee pain began to flare up again, Plaintiff scheduled an appointment with Reginald Eugene Bass, M.D. (hereinafter referred to as "Dr. Bass"), an orthopedic surgeon. (Tr. 222) Plaintiff underwent an MRI scan of his right knee ordered by Dr. Bass. *Id.* The MRI scan revealed a medial collateral ligament grade I strain, an associated medical femoral condyle bone bruise, a grade 1 strain of the lateral meniscus and a small baker's cyst and a small synovial cyst. *Id.* Dr. Bass opined that Plaintiff would continue to suffer from recurring flare ups and swelling of the right knee, and have problems bending his knee permanently. *Id.* Dr. Bass further believed Plaintiff would likely only allow between 0 and 20 degrees of flexion of the right knee without complaining of pain on motion. *Id.* On September 20, 2006, following an incident where Plaintiff fell to the ground after his right knee flared up, Plaintiff underwent another MRI scan of his right knee ordered by Dr. Bass. *Id.* The MRI revealed an early arthritic change in the lateral knee joint manifested by joint space narrowing, and an early subchondral cyst formation in the lateral femoral condyle. (Tr. 220) However, after comparing this MRI scan with previous MRI scans of Plaintiff's right knee, Dr. Bass discerned that the previously noted grade 1 strain of the lateral meniscus and the MCL had resolved on its own, and that the small baker's cyst was not as well seen as before. *Id.* Plaintiff received an

examination on May 5, 2008 from Vasanthi Nalluri, M.D. (hereinafter referred to as "Dr. Nalluri"), a board certified neurologist, to determine whether there was any significant nerve or tissue damage in Plaintiff's right knee. (Tr. 17) During the examination, Plaintiff asserted that he was suffering from constant pain and giving away of his right knee on a daily basis. *Id.* Dr. Nalluri conducted an examination on Plaintiff, which revealed no nerve damage, swelling, redness or warmness in Plaintiff's right knee. *Id.* Dr. Nalluri also conducted an x-ray of Plaintiff's right knee, which returned a normal finding. *Id.* Dr. Nalluri opined that, in relation to the Plaintiff's service connected residuals of the right knee, there was a fifty percent chance Plaintiff's knee injury would affect his active physical employment activities. *Id.* Dr. Nalluri further opined that Plaintiff's knee injury would likely not affect Plaintiff's ability to perform sedentary work. *Id.*

As to Plaintiff's ethanol abuse, the ALJ found that Plaintiff suffered from extreme and excessive ethanol use as a result of his service in the military. (Tr. 12) While serving in the military, Plaintiff was involved in a helicopter crash in Germany in which six people were killed and he was one of the two survivors. (Tr. 28) Plaintiff was physically hurt in the crash. *Id.* The injuries Plaintiff sustained required him to be hospitalized for two to three weeks. (Tr. 12) Plaintiff contends he also suffered from severe nightmares, impaired sleep and intrusive memory, as well as a feeling of extreme guilt for surviving the accident. *Id.* Furthermore, Plaintiff claims he was constantly in a depressed mood because he did not have any family or friends come visit him following the accident. (Tr. 38) Plaintiff testified that both the accident and having no family or friends by his side led him to experiment with ethanol. *Id.* Plaintiff alleges he eventually began consuming ethanol at an excessive rate, until he claims to have begun suffering from delirium and tremors. *Id.* Plaintiff was admitted to the VA, his primary treating hospital, for

observation on October 21, 2007. (Tr. 18) After being discharged from the VA on October 22, 2007, Plaintiff was admitted back to the VA emergency room sixteen hours later due to hallucinations based on mixing his various medications with alcohol. *Id.* According to medical records prepared by his VA treating physician, Isaac Dale, M.D., Plaintiff was "suffering from abdominal pain, was restless all night and was seeing things". *Id.* On October 31, 2007, Plaintiff signed out of the VA claiming he felt fine. *Id.* Plaintiff claims he subsequently attended Alcoholics Anonymous (AA) classes for a short while after the accident and alcohol relapses, but later stopped attending the program, citing no particular reason. (Tr. 39) Plaintiff claims he has not consumed alcohol since 2007. (Tr. 27)

As to his pancreatitis condition, Plaintiff contends that his pancreas suffered damage as a result of the aforementioned helicopter crash while in the military. *Id.* The record indicates that on April 26, 2007, Plaintiff visited Iqbal Savani, M.D., (hereinafter referred to as "Dr. Savani") and underwent a CAT scan of his pancreas and pelvic area because he was suffering from epigastric pain, nausea and excessive vomiting. (Tr.18) The results from the April 26, 2007 CAT scan revealed that Plaintiff suffered from a dilated appendix, an enlarged fatty liver, a mildly contracted gallbladder and chronic pancreatitis. *Id.* Due to increasingly excessive pain, Plaintiff required surgery to remove one-half of his pancreas. *Id.* This surgery required his hospitalization at the VA Medical Center for two weeks. *Id.*

Plaintiff asserts that because of all his disabilities, he lives a very inactive lifestyle. (Tr. 19) Plaintiff testified that he sits in his lazy boy chair and watches television during the day. *Id.* Plaintiff alleges that he eats, takes any necessary medications, and then sleeps at night. *Id.* Furthermore, Plaintiff alleges he has trouble getting to sleep, and when he does sleep, he has trouble staying asleep. *Id.* Plaintiff stated that during the day he rolls around in a wheelchair

when moving throughout his home. *Id.* Most days, Plaintiff alleges he does not even leave his home. *Id.*

## STANDARD OF REVIEW

When the Court reviews the Commissioner's decision, it must be determined whether or not there is substantial evidence in the record to support the findings and also ensure that the proper legal standards were applied. *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124 (6th Cir. 2003) Substantial evidence means more than a mere scintilla but less than a preponderance. *Andrews v. Shalala*, 53 F.3d 1035 (9th Cir. 1995). The Court must weigh all the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 897 F.2d 771 (9th Cir. 1980). On appeal, the court may not re-weigh the evidence or use its own judgment over that of the Commissioner. *Hollis v. Bowen*, 837 F.2d 1378 (5th Cir. 1983)

## ANALYSIS

The Social Security Administration uses a five step evaluation process under 20 CFR § 404.1520(a) to determine whether an individual is disabled. Under the first step, the court must look at whether the individual is engaged in substantial gainful activity, which is defined as activity that involves performing significant physical or mental activities for pay or profit. 20 CFR § 404.1520(b); *see also* 20 C.F.R. § 404.1572(a). If it is determined that the individual is engaged in substantial gainful activity, he will automatically be determined not disabled, regardless of the type of and severity of the physical and mental impairments he suffers from. *Id.* However, if the individual is not engaging in substantial gainful activity, the court must move to step two and determine whether the impairment the individual suffers is considered "severe". 20 CFR § 404.1520(c). An impairment will be considered "severe" if that it significantly limits that individual's ability to perform work activities. *Id.* A finding of severity will automatically move

the evaluation process to the third step. Under the third step, the court must determine if the individual's impairment meets a certain criteria, found under 20 CFR Part 404, Subpart P, Appendix 1. 20 CFR § 404.1520(d) If the individual's impairment or impairments meet the criteria set out in this section, that individual will be considered "disabled" and no further examination is necessary. If the individual's impairment does not meet the set out criteria, the court must proceed to the fourth step. 20 CFR § 404.1520(e). The fourth step requires the court, to determine an individual's residual functional capacity, or ability to work despite impairment. 20 CFR § 404.1520(f). Testimony from a vocational expert is usually obtained to aid in the determination as to whether the individual can perform sustained physical and mental work, as well as past relevant work, despite his impairments. *Id.* If the court finds that an individual possesses residual functional capacity, the evaluation process proceeds to the fifth and final step. *Id.* Under the fifth step, the court must determine the individual can perform any work at all considering his age, education, work experience and residual functional capacity. 20 CFR § 404.1520(g). Once again, this is usually determined in part by testimony from a vocational expert. If the individual can perform any work at all, he will not be considered disabled, whereas if it is determined that the individual cannot perform any other work, he will be determined to be disabled.

In the matter as to the first step of the evaluation, the ALJ determined that the Plaintiff had not engaged in any type of substantial gainful activity since the onset of his disability. (Tr. 13) Under step two, the ALJ determined that Plaintiff's impairments were in fact "severe" under the given meaning of the term. *Id.* However, under step three, the ALJ concluded that the impairments that Plaintiff suffered from were not consistent with the list of requirement impairments set forth in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 15) Under step four, the

ALJ examined Plaintiff's residual functional capacity, and concluded that Plaintiff could not perform any past relevant work, or any type of work, absent substance abuse. *Id.* Under step five, the vocational expert, after being presented with Plaintiff's impairment and past work record, testified that there were still a significant number of jobs available that Plaintiff could perform, and classified those jobs with regard to the amount of exertion and skill required to perform the job, known as "specific vocational preparation level". (Tr. 17) The higher the "specific vocational preparation level" is for a given job, the higher the amount of exertion and skill that job requires. *Id.* The vocational expert concluded that Plaintiff could perform the job of surveillance monitor (500 positions locally and 120,000 positions nationally with a specific vocational preparation level of two), food cashier (1,000 positions locally and 100,000 positions nationally with a specific vocational preparation level of three) and information clerk (600 positions locally and 150,000 positions nationally with a specific vocational preparation level of four). (Tr. 19) The ALJ found that based on Plaintiff's past relevant work history as a cook and his residual functional capacity, Plaintiff could perform the sedentary job of surveillance monitor. *Id.* Thus, the ALJ held that the Plaintiff was not disabled under the terms of the Social Security Act and was not entitled to disability benefits. (Tr. 22)

Plaintiff claims there is not substantial evidence in the record to support the ALJ's finding that Plaintiff is not disabled under the terms of the Social Security Act, and therefore would be able to perform jobs with a significant number in the local or national economy. (Pl.'s Mem. [14] 5) Furthermore, Plaintiff argues that the ALJ did not meet his burden under step five of the evaluation process by providing a significant number of jobs in the national economy Plaintiff can perform. (Pl.'s Mem. [14] 6) Therefore, Plaintiff believes he should be "disabled" and begin receiving disability benefits from the time of his disability's onset. (Pl.'s Mem. [14] 7)

Plaintiff claims there is not substantial evidence within the record to establish the Commissioner's burden of proof under the fifth step of the evaluation process, which determined that Plaintiff was not disabled. (Pl.'s Mem. [14] 5) However, the vocational expert's testimony regarding jobs Plaintiff could perform acceptably can be regarded as substantial evidence that Plaintiff is disabled. *Stivers v. Astrue,* 2012 WL 1658642 (E.D. Ky., 2012) In *Stivers*, the ALJ determined Plaintiff had "severe" impairments consisting of degenerative disc disease of the cervical spine and peripheral vascular disease. *Id.* at 3. The ALJ questioned the vocational expert regarding jobs Plaintiff could perform at 46 years of age with a high school education and prior work experience as a dry waller and rural mail carrier, taking into account his non-exertional restrictions. *Id.* The vocational expert testified that even though Plaintiff could not climb any ladders or stairs, had a limited ability to reach all directions and needed to avoid all exposure to hazards, he could still perform the jobs of security guard worker and industrial gate guard. *Id.* The ALJ relied on the testimony of the vocational expert as enough substantial evidence that Plaintiff retained the residual functional capacity to perform the jobs of security guard worker or industrial gate guard. *Id.* The court in *Hollan v. Apfel,* 2001 WL 180151 (N.D. Tex. 2001), also held that the vocational expert's testimony is proper substantial evidence. In *Hollan*, the court held that when weighing the vocational expert's testimony as substantial evidence, the significant finding at issue is not that Plaintiff could perform a specific number of available jobs, but rather that he could in general perform work which exists in significant numbers in the state and national economy. *Id.* at 8. The *Hollan* court relied on testimony from the vocational expert that there were at least 37,500 machine tender jobs in Texas and 55,500 nationally that Plaintiff could perform, with restrictions imposed by his physician of Plaintiff's severe neck pain, hearing loss, hypertension and anemia. *Id.* at 2. In reaching this conclusion, the court looked at

the vocational expert's testimony with regards to general work in the economy that Plaintiff could perform, not a specific number of jobs, to find the testimony as substantial evidence that there was work Plaintiff could perform. *Id.* at 8.

In this matter, the ALJ relied heavily on the testimony of the vocational expert regarding Plaintiff's work abilities based on hypothetical questions posed by the ALJ and Plaintiff's attorney. (Tr. 59-63) When the ALJ posed a similar hypothetical to the one asked in *Stivers, supra*, considering whether the Plaintiff, 48 years old with a twelfth grade education, could perform any job having been classified as having a full range of sedentary work with limited walking and standing, occasional climbing of stairs and no work around hazardous equipment, the vocational expert testified that Plaintiff could perform the skill two sedentary job of surveillance monitor. (Tr. 60) This analysis was based on the vocational expert's knowledge of Plaintiff's residual functional capacity and his past relevant work history. (Tr. 59) This Court finds that the ALJ gave proper deference to and properly regarded the vocational expert's testimony as substantial evidence that Plaintiff could perform jobs that are significant in number in the local and national economy.

Next, Plaintiff contends that the ALJ did not meet his burden of proof in step five of the Social Security Administration's evaluation process by providing a significant number of jobs in the economy that Plaintiff could perform. (Pl.'s Mem. [14] 6) The Court finds that Plaintiff places too much emphasis on the meaning of the term "significant number", believing that the term "significant" must be a large or substantial number. Courts have refused to draw a bright line standard for the minimum number of jobs required to show that work exists in significant numbers, but have generally held that what constitutes a "significant" number of jobs is a "relatively low threshold number." *Gurule v. Astrue*, 2012 WL 1609691 (D. Vt. 2012) In *Gurule*,

*supra*, the Court held that 370 local jobs of office cleaner, price marker and inserter constituted a "significant number". *Id.* The Court further finds as it relates to Plaintiff's argument that the ALJ must provide a "significant" number, Plaintiff places too much emphasis on the number of local Mississippi surveillance monitor jobs (500), rather than the overall number of surveillance monitor jobs (120,000) within the surrounding local regions, or even regions nationally. *Williams v. Astrue*, 2012 WL 1113393, at 3 (W.D.N.Y. 2012). The *Williams* Court declined to determine whether 217 local jobs is a sufficiently "significant" number because the presence of 58,000 jobs nationally would satisfy the Commissioner's burden. *Id.* at 5. Courts have held that a significantly less number of surveillance monitor jobs can be construed as a significant number of jobs in the economy. *Thompson v. Astrue*, 2011 WL 3861693, (S.D. Ohio, 2011) In *Thompson*, the court held that 145 surveillance monitor jobs in the regional economy and 25,210 surveillance monitor jobs in the national economy constitute a significant number of jobs in the economy. *Id.* The number of regional jobs is not the defining factor, and the ALJ may satisfy his burden of proof by demonstrating that works exists in either the region the Plaintiff resides or in several regions of the country. *Gurule, supra* at 4. The Court finds that 500 jobs in Mississippi and 120,000 jobs nationwide as a surveillance monitor constitutes a "significant number" of jobs in the local and national economy. (Tr. 19) Therefore, the Court finds that the number of surveillance monitor positions identified by the vocational expert and relied on by the ALJ support his finding at step five that the Plaintiff could perform work that existed in significant numbers in the economies.

## **RECOMENDATION**

The Court has fully reviewed the record on this matter and finds that the Commissioner did not err as a matter of law in reaching his decision, and that his decision was based on a

finding of substantial evidence. Therefore, the Court recommends that the decision of the Commissioner should be affirmed. Furthermore, the Court recommends that Plaintiff's Motion [13] for Summary Judgment be denied.

In accordance with the Rules of this Court, any party within fourteen days after being served a copy of this recommendation, may serve and file written objection to the recommendations, with a copy to the Judge, the U.S. Magistrate Judge and the opposing party. The District Judge at that time may accept, reject or modify in whole or in part, the recommendation of the Magistrate Judge, or may receive further evidence or recommit the matter to this Court with instructions. Failure to timely file written objections to proposed findings, conclusions, and recommendations contained in this report will bar an aggrieved party, except on the grounds of plain error, from attacking on appeal-unobjected to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United States Automobile Association*, 79 F.3d 1425 (5th Cir. 1996).

THIS the ___31st___ day of July, 2012.

                                        s/ John M. Roper Sr.
                                        CHIEF UNITED STATES MAGISTRATE JUDGE